IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ARTURO MARTINEZ,                        )
                                        )
                    Plaintiff,          )
                                        )
        v.                              )    No.  07 C 3442
                                        )
FREEDOM MORTGAGE TEAM, INC.,            )
et al.,                                 )
                                        )
                    Defendants.         )

<u>MEMORANDUM OPINION AND ORDER</u>

Freedom Mortgage Team, Inc. ("Freedom") and Encore Credit

Corporation ("Encore")[1] move jointly under Fed. R. Civ. P.

("Rule") 12(b)(6) to be dismissed from this action brought

against them and Freedom employee Graco Funes ("Funes")[2] by

Arturo Martinez ("Martinez").[3]  To state a claim that survives

Rule 12(b)(6) scrutiny, Rule 8(a) requires that the complaint

(1) put defendant on "fair notice of what the...claim is and the

_____

        [1] Although Encore reports that it has now become
Performance Credit Corporation, this opinion will refer to it by
its name at the time of the transaction at issue (and as it was
named in the Complaint).

        [2] Funes has not joined in the current motion.

        [3] Even though Martinez advances only a single claim in the
(correct) federal sense (see <u>NAACP v. Am. Family Mut. Ins. Co.</u>,
978 F.2d 287, 291-93 (7th Cir. 1992)), his counsel has followed
the nigh universal practice among Illinois-based practitioners of
carving up that claim into a series of separate counts, each
advancing a different theory of liability (contrast the teaching
of Rule 10(b) as to the proper use of separate counts).  Because
the parties have gone to war on the separate-count battlefield,
this opinion perforce follows their lead.

1

grounds upon which it rests" and (2) plausibly suggests that plaintiff has a right to relief (EEOC v. Concentra Health Servs., Inc., 496 F.3d 773, 776 (7th Cir. 2007), quoting and citing Bell Atl. Corp. v. Twombly, __ U.S __, 127 S.Ct. 1955, 1964-65, 1973 n.14 (2007)). And where as here fraud is charged, Rule 9(b) adds the need for greater specificity: the circumstances constituting fraud must be stated with particularity.

## Facts[4]

Martinez is a Spanish-speaking Chicagoan of Hispanic origin (¶¶4-6), while Freedom is a mortgage broker and Encore is a residential mortgage lender (¶¶7, 10). Martinez' relationship with them began when his real estate agent referred him to Funes to seek financing to purchase a home (¶¶8, 12). Martinez met with Funes at Freedom's offices and eventually applied for a loan with Encore through Funes (¶12).

During the application process Martinez provided Funes with accurate information about his employment and finances, but Funes inserted false information into the loan application that portrayed Martinez more favorably (¶¶34, 43). Funes also ordered

---

[4] Rule 12(b)(6) requires this Court to accept as true all well-pleaded factual allegations, drawing all reasonable inferences in Martinez' favor (Christensen v. County of Boone, 483 F.3d 454, 457 (7th Cir. 2007)(per curiam)). Hence this section tracks Martinez' Second Amended Complaint (simply referred to as "Complaint") without the need to insert "Martinez alleges" or similar qualifiers. All Complaint citations will simply take the form "¶--."

a house appraisal by William Beredimas ("Beredimas") of Precision Appraisals, an agent of Funes or Freedom or both (¶35). Funes told Beredimas of the figure he needed to support the amount of Martinez' prospective loan, and the two agreed on an inflated appraised value for the property (¶¶45-47). Funes then inserted that appraisal figure into the mortgage application (¶48).

Funes submitted the mortgage application to Encore, which approved it despite knowledge that the appraised value of the property was false (¶49). Funes told Martinez he was qualified for the loan and explained that the monthly payment would be $2,400, inclusive of amounts for escrow deposit, and that the monthly payments would later decline (¶37).

Although Martinez' dealings with Funes were conducted exclusively in Spanish (¶38), at the closing Martinez signed the mortgage documents prepared solely in the English language, with no accompanying Spanish translation or explanation (¶¶39, 41). Martinez' actual mortgage was an adjustable rate mortgage with an interest rate that can only increase (and never decrease) from the initial rate (¶40).

<u>Yield Spread Premiums</u>

Encore paid Freedom a $3,390 yield spread premium ("Premium")[5] in conjunction with the mortgage transaction (¶15).

---

[5] Though there are of course many other (and perfectly appropriate) types of "premium," this opinion employs what might otherwise be a generic term--"Premium" simpliciter--to denote the

When a borrower agrees to pay interest rates higher than their "par" rate (the minimum interest rate at which the lender would make the loan), the lender may pay a Premium to the broker (¶16). Calculation of the Premium amount is based on how much the interest rate is above the "par" figure (formulas for determining such rates are sent by lenders to brokers on a regular basis), and a higher interest rate results in the broker receiving a larger Premium (¶¶17-18).

Freedom and Encore assert as their first ground for dismissal that all counts should be dismissed because Premiums are not illegal. But that is really a nonstarter, because some Premiums are legal and some are not--indeed, the Department of Housing and Urban Development has stated that Premiums in the mortgage industry are neither per se illegal nor legal under Real Estate Settlement Procedures Act ("RESPA") §8, 12 U.S.C. §2607 (see 66 Fed. Reg. 53052). More importantly, the legality of Premiums is irrelevant for the purposes of this lawsuit, for Martinez seeks no RESPA-based recovery.

Thus accepting the legality of the Premium paid by Encore to Freedom provides no answer to the inquiry as to whether the mortgage procedure was navigated free of discrimination or

---

particular type described in the text.

fraud.[6]  Plenty of perfectly legal activities can be infected with tortious discrimination or fraud, and the provision of residential mortgages is no exception.

## Racial Discrimination

Freedom and Encore assert that Martinez' claims of discrimination in violation of the Fair Housing Act ("Housing Act," 42 U.S.C. §3605) and the Equal Credit Opportunity Act ("Credit Opportunity Act," 15 U.S.C. §1691) fail because denial of credit is a required component of a successful claim of discriminatory treatment under both of those sections.  Martinez has not asserted a _denial_ of credit, complaining instead of burdens associated with his _receiving_ credit.  But that contention by Freedom and Encore is dead wrong, because both statutes clearly do _not_ require a denial of credit.

Under the Housing Act it is "unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions[7] to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race..." (42 U.S.C. §3605(a)).  As a matter of plain meaning, it is of course

---

[6]  Whether the fees charged to Martinez were below the level of "excessive fees" is similarly irrelevant.

[7]  "Residential real estate-related transactions" include loans for purchasing a dwelling (42 U.S.C. §3605(b)(1)(A)).  Freedom (as a broker) and Encore (as a lender) were both engaged in such transactions.

possible to engage in the setting of discriminatory "terms and conditions" in granting as well as in withholding credit.[8]

Congress spoke even more clearly (if possible) in setting out the Credit Opportunity Act provision that a creditor[9] may not "discriminate against any applicant, with respect to any aspect of a credit transaction--on the basis of race" (15 U.S.C. §1691(a)(1)). If anything, "any aspect of a credit transaction" meshes even more plainly with a case involving the granting of credit than with one where credit was denied, even though most litigation under that section has arisen from the latter situation. Simply put, a race-based loan rejection is merely a sufficient (but not a necessary) form of discrimination under the statute (see <u>JAT, Inc. v. Nat'l City Bank of the Midw.</u>, 460 F. Supp. 2d 812, 820 (E.D. Mich. 2006)).

---

[8] In that respect Freedom's and Encore's attempted reliance on <u>Latimore v. Citibank, F.S.B.</u>, 979 F. Supp. 662, 665 (N.D. Ill. 1997) is unavailing. <u>Latimore</u>'s statement of four requirements for a prima facie Housing Act claim was prefaced with the qualifying language "in a case where the plaintiff alleges that her loan application was discriminatorily denied, she must prove..." (<u>id</u>.). That does not at all mandate a denial of credit as a prerequisite to every Housing Act theory of recovery.

[9] "Creditor" includes "any person who regularly extends, renews, or continues credit" (e.g., Encore) as well as "any person who regularly arranges for the extension, renewal, or continuation of credit" (e.g., Freedom)(15 U.S.C. §1691a(e)). In the latter respect, the applicable regulation specifies that mortgage brokers (such as Freedom) that do not participate in credit decisions are still regarded as "creditors" for the purposes of the Credit Opportunity Act's proscription against discrimination (see 12 C.F.R. §202.2(*l*)(2)).

Martinez' discrimination-based contention asserts that in
conjunction with loans made to minority borrowers, Encore pays
and Freedom accepts higher Premiums than in loans made to non-
minority borrowers (¶20, 58, 63).  Higher Premiums stem from
higher interest rates for borrowers (relative to their actual
risk).  If higher Premiums are indeed paid on minority borrowers'
loans then on comparable loans to their non-minority
counterparts, that correlates with those minority borrowers
having received loans on less favorable terms than their
counterparts.

To be sure, Premiums are not inherently discriminatory.
Lenders such as Encore provide brokers such as Freedom with rate
sheets indicating what percentage of the total loan amount the
broker will receive for inducing a borrower to accept an interest
rate over the "par" rate.  Lenders of course want to extend
credit at as high an interest rate as possible.  Premiums create
the incentive for brokers, in an effort to obtain the highest
possible commission, to induce borrowers to agree to the highest
possible interest rate.

Any lender will pay the same Premium to a broker regardless
of whether the broker convinced a non-minority person or a member
of a racial minority to accept an interest rate higher than that
individual's "par" rate.  But discrimination can creep into that
otherwise permissible equation if the broker makes

disproportionate attempts to pressure racial minorities into
accepting interest rates above their "par" rates (or rates
disproportionately higher than their "par" rates).

At the core of Martinez' Complaint is the assertion that
when Freedom saw someone of Hispanic origin such as himself walk
into its office to apply for a mortgage, Freedom pushed harder
for that person to agree to a higher interest rate than it would
have had that applicant been white. Martinez' claim that
"[d]efendants, on average, subjected plaintiff and other minority
borrowers to more frequent and/or larger Premiums due to their
race" (¶20) is framed awkwardly, but its intended meaning is
clear. Borrowers are not "subjected to" Premiums--Premiums are
paid by lenders to brokers. If a broker talks a borrower into
accepting a higher interest rate when he or she is qualified for
a lower rate, that borrower is then "subjected to" the higher
rate by the lender. Semantics notwithstanding, allegations of
such conduct by Freedom properly plead actionable racial
discrimination under both the Housing Act and Credit Opportunity
Act.

In paying a Premium, a lender compares race-neutral factors
(the borrower's "par" rate versus the actual interest rate
accepted) in determining whether and to what extent to pay a

Premium to the broker.[10]  But Martinez further alleges that
Encore (1) knew that offering Premiums was causing its brokers to
act in a discriminatory manner (¶¶22, 26–27) and (2) targeted
minorities for higher cost loans by purposefully utilizing
brokers who served minority communities (¶¶27–29).  While
knowingly reaping the benefits of another's discrimination may
not necessarily connote a discriminatory intent on the part of
the reaper, a discriminatory effect (even absent any
discriminatory intent) can constitute a violation of the Housing
Act (<u>Gomez v. Chody</u>, 867 F.2d 395, 402 (7th Cir. 1989)).
Furthermore, targeting racial minorities for higher cost loans
sets out a discrimination-based theory of recovery under both the
Housing Act and the Credit Opportunity Act.

<u>Illinois Consumer Statute</u>

Martinez also claims that all three defendants violated two
separate sections of the Illinois Consumer Fraud and Deceptive
Business Practices Act ("Illinois Act," 815 ILCS 505/1 to
505/12).[11]  Any person who suffers actual damages as a result of
a violation of the Illinois Act may bring a private action under
Section 10a(a).  Martinez pleads actual damages resulting from

---

[10]  Martinez does not allege that Encore discriminated by
paying brokers a different commission depending on the race of
the borrower.

[11]  Citations to the Illinois Act will take the form
"Section --," omitting the prefatory "815 ILCS 505/."

violation of both Section 2N and Section 2 (¶¶73-74), and this
Court finds such a theory plausible at this threshold stage.

Section 2N

Martinez claims in part under Section 2N(b), which obligates
a retailer that acts as a consumer's "interpreter" to obtain a
signed consent form from a consumer whenever the retailer (or its
employee) conducts, in a language other than English, a retail
transaction or negotiations related to a retail transaction
resulting in a written contract.  Martinez signed no such form
despite conversing with Funes solely in Spanish (¶38).  In
response the current motion contends that Martinez fails to plead
that Freedom, Encore or Funes donned an "interpreter" cap during
the transaction, so that no signed form was necessary.  Even
though that contention could well be rejected on the basis that
for pleading purposes Martinez' allegations alone create the
reasonable inference that fills the asserted void, this opinion
will go on to address the issue in a bit more detail.

Here the statute provides no definition of the word
"interpreter."  In the absence of a statutory definition, this
Court must itself act as interpreter to "give the word its plain,
ordinary, and popularly understood meaning" (People v. Brooks,
221 Ill. 2d 381, 390, 851 N.E.2d 59, 63 (2006)).  In doing so
this Court must also be mindful of the Illinois General
Assembly's directive to construe the Illinois Act liberally to

effectuate its purpose (Section 11a):  "to protect consumers, borrowers, and business persons against fraud, unfair methods of competition, and other unfair and deceptive business practices" by "provid[ing] broader consumer protection than a common law fraud action" (<u>Crichton v. Golden Rule Ins. Co.</u>, 358 Ill. App. 3d 1137, 1145, 832 N.E.2d 843, 851 (5th Dist. 2005)).

Although Funes did not provide a word-for-word translation of the mortgage contract, he did act as Martinez' "interpreter" during the transaction.  Black's Law Dictionary 838 (8th ed. 2004) defines "interpreter" as a "person who translates, esp. orally, from one language to another."  Funes did exactly that by telling Martinez in Spanish the contents of the English-language documents and in laying out for him the key terms of the contract (such as the monthly payments and the assertion that the payments would subsequently decline).

It matters not whether Funes interpreted the contract accurately (for example, whether the contract really stated that the monthly payments would decrease)--one cannot avoid "interpreter" status by making a poor translation (or by purposefully misstating the terms of the contract).  Any such reading would frustrate the purpose of Section 2N to safeguard consumers by requiring that retailers acting as interpreters do so accurately.

Martinez does not plead interaction with anyone other than

Funes in conjunction with the mortgage transaction.  Section 2N demands that a retailer must secure a signed form whenever the retailer or its employee acts as an interpreter.  By contrast, because no Encore employee interacted with Martinez, it could not have violated Section 2N because it never acted as an "interpreter."  As to Section 2N, then, Encore's motion for its dismissal is granted while Freedom's identical motion is denied.

Section 2

Martinez advances a claimed second violation of the Illinois Act, this time of its Section 2, by all three defendants.  Section 2 outlaws unfair methods of competition and unfair or deceptive acts or practices in the conduct of trade or commerce.

To state a basis for recovery under Section 2, a plaintiff must prove (1) a deceptive or unfair act or practice by defendant, (2) defendant's intent that plaintiff rely on the deception and (3) the occurrence of the deception during a course of conduct involving trade or commerce (Robinson v. Toyota Motor Credit Corp., 201 Ill. 2d 403, 417, 775 N.E.2d 951, 960 (2002)).[12]  With interpretations of Section 5(a) of the Federal Trade Commission Act providing guidance, conduct is deemed "unfair" by weighing (1) whether the practice offends public policy, (2) whether it is immoral, unethical, oppressive or

---

[12]  Although that listing does not specifically include "unfair" in the elements of the offense, the very next sentence of Robinson, id. does so.

unscrupulous and (3) whether it causes substantial injury to consumers (Robinson, id. at 417, 775 N.E.2d at 960-61).

Martinez' Complaint recites a (non-exhaustive) laundry list of allegedly deceptive or unfair conduct to which he was subjected (¶69). Most of that conduct is ascribed to Freedom, but alleged earlier in the Complaint is that Encore approved Martinez' loan application, even though knowing that the appraisal value was false, to induce Martinez to take out a larger loan (¶¶49, 51). Such conduct is of course "unfair" (knowingly approving home loans based on false information offends public policy, is unscrupulous and can cause substantial injury to consumers) if not downright deceptive.

As for the laundry list of charges against Freedom, Martinez surely also pleads deceptive conduct (arranging for a fraudulently inflated appraisal and misrepresenting the loan terms and monthly payments[13] plainly qualify as deceptive). And the Complaint also alleges the requisite intent that Martinez rely on the improper conduct (¶71) as well as the requisite course of trade or commerce[14] (a home mortgage application and

---

[13] Contrary to the motion's arguments, "disclosing" the true terms of the loan agreement to Martinez later, in a document written in a language foreign to him, does not make the earlier misrepresentation any less deceptive.

[14] "Trade" and "commerce" are broadly defined by Section 1(f) to include (among other things) any sale of any tangible or intangible property, service or thing of value.

contract) (¶70).

In sum, all of the elements of Section 2 recovery have been well pleaded.  Accordingly the challenge to that aspect of Martinez' case is denied.[15]

<u>Fraud</u>

Martinez alleges that Freedom and Encore each defrauded him by misrepresenting that he was qualified for the loan he received:

1.  Freedom inflated his income by a factor of three on his loan application and colluded with its appraiser to ensure that the appraised value of the property would exceed the purchase price (¶44-45).

2.  Encore approved the loan despite its knowledge that those figures were falsified on the application (¶49).

In that respect <u>Soules v. Gen. Motors Corp.</u>, 79 Ill. 2d 282, 286, 402 N.E. 2d 599, 601 (1980) continues to be cited as the leading Illinois case defining the elements of common law fraud:  (1) a false statement of material fact (2) known or believed to be false by the party making it, (3) intent to induce the other party to act, (4) action by the other party in justified reliance

---

[15]  Martinez' Complaint does muddy the waters somewhat by alleging that Section 2 was violated in part by "[f]ailing to comply with §2N" (¶69(b)).  Even though the conduct proscribed by Section 2N may also fall within the category of deceptive conduct, that need not be the case--Section 2N liability does not hinge on such a showing.

on the truth of the statement and (5) damage to the other party resulting from such reliance.

Martinez properly alleges a false statement of material fact--the rigged approval of his loan and the communication to him of that approval. Misrepresentations are deemed "material" if plaintiff would have acted differently had the truth been known or if the misrepresentation concerned the type of information upon which plaintiff would be expected to rely (Miller v. William Chevrolet/Geo, Inc., 326 Ill. App. 3d 642, 650, 762 N.E.2d 1, 7 (1st Dist. 2001)). If Martinez had been apprised that his actual financial circumstances would not suffice to support repayment of the improperly inflated loan (which was nonetheless offered to him), that information surely would have been highly material to his decision whether or not to proceed with the loan--and moreover (though this is not vital to this element of the fraud offense), it is certainly reasonable to infer that a "no" decision would have been the result.

Knowledge of the falsity by both Freedom and Encore has been properly pleaded (¶45, 49, 78). Likewise, the Complaint also alleges the intention to induce Martinez' acceptance of the loan and his actual reliance on the misrepresentation (again, by his acceptance of the loan)(¶51, 79, 81). Martinez' reliance was reasonable--where both lender and broker inform a borrower that a loan is approved, the borrower should be able to take that

15

assertion at face value (and need not engage in assessing his own creditworthiness). On that score Freedom and Encore have made no showing that the loan terms were so onerous that Martinez was unreasonable in believing that he could meet them. While Martinez did of course know his own income and assets, he could not know on his own that he was unqualified to take on the loan, especially given that the amount and structure of the monthly payments were also misrepresented to him.

Damages is the final element of Illinois common law fraud. Here the misrepresentations to Martinez resulted in his taking on a mortgage obligation that exceeded the value of the property. Martinez' injury is that he owes more on his home than it is worth and is therefore trapped in Encore's adjustable, negatively amortizing loan (¶50). Inducing a borrower to agree to a mortgage after both the terms of the mortgage and his qualification for the loan have been thus misrepresented causes injury to the borrower: Martinez is stuck in a loan that he did not want and may not be able to pay. Martinez agreed to enter into a mortgage--but not this one.

Supplying Martinez with the loan contract disclosing the true terms of the agreement in English does nothing to vitiate the fraud, because Martinez was unable to read the contract. Under Illinois law contracting parties generally have a duty to become aware of the contents of their contracts, but one party

may justifiably rely on the representations of another when (as here) the parties lack equal knowledge or further inquiry into the contract terms has been blocked (<u>Los Amigos Supermarket, Inc. v. Metro. Bank & Trust Co.</u>, 306 Ill. App. 3d 115, 128, 713 N.E.2d 686, 695 (1st Dist. 1999)).  Here Martinez justifiably relied on Funes' representation because the document was provided to him only in a language foreign to him:  English.[16]  "Disclosing" the true terms of a document written in a foreign language is tantamount to no disclosure at all.

As Freedom and Encore would have it, Martinez cannot cry "Deception!" after signing a contract with his eyes figuratively closed, because he had the obligation to discover the meaning of what he was signing.  What they gloss over (or more accurately, disregard entirely) is that Martinez reasonably believed that he had been informed of the meaning of what he was signing, but unfortunately for him his interpreter (Funes) spoke with forked tongue in providing the English-to-Spanish translation.

<u>Civil Conspiracy To Commit Fraud</u>

Martinez also pleads a civil conspiracy to commit fraud among Funes, Freedom and Encore in conjunction with the bogus appraisal value of the property.  Under Illinois law the elements of a civil conspiracy are (1) a combination of two or more

_____

[16]  Martinez had no duty to hire a translator to verify that Funes was properly relaying the terms of the contract to him.

persons (2) for the purpose of accomplishing, by some concerted action, either an unlawful purpose or a lawful purpose by unlawful means, (3) in furtherance of which one of the conspirators committed an overt tortious or unlawful act (<u>Fritz v. Johnston</u>, 209 Ill. 2d 302, 317, 807 N.E.2d 461, 470 (2004)).

Funes, Freedom and Beredimas allegedly manipulated the appraisal of the property by artificially inflating the property value, while Encore purposefully overlooked the inflated appraisal in order to approve the loan.  According to the Complaint Funes (as a Freedom employee) and Beredimas are both agents of Freedom (¶¶8, 36).  Under Illinois common law no conspiracy can exist between a principal and an agent because the acts of the agent are deemed to be the acts of the principal (<u>Buckner v. Atl. Plant Maint.</u>, 182 Ill. 2d 12, 24, 694 N.E.2d 565, 571 (1998)).  When a body and its limbs agree to act, it does not create an actionable conspiracy.  For purposes of the conspiracy charge, then, the autonomous actors are distilled to two: Freedom (including its agents Funes and Beredimas) and Encore.

Rule 9(b)'s heightened specificity requirement applies whenever a claim is "premised upon a course of fraudulent conduct" (<u>Borsellino v. Goldman Sachs Group, Inc.</u>, 477 F.3d 502, 507 (7th Cir. 2007)), and that of course extends to a claim of conspiracy to commit fraud.  What is often overlooked, however,

is that Rule 9(b) mandates only that the <u>circumstances</u> constituting fraud be stated with particularity. If those circumstances are well and particularly pleaded, it would saddle plaintiffs with an inordinate burden to require that the depth and breadth of the collusion must also be set out in detail.[17]

Here Martinez avers that the fraud was the product of connivance, rather than of individual actors working independently (and unknown to each other) toward a common fraudulent goal (¶¶85, 87). At this stage such a pleading sufficiently sets out a combination of Freedom and Encore to withstand a motion to dismiss.

Every conspiracy must have a stated goal, else it is merely a combination of two or more persons working in concert to no particular end. Here the purported end was to convince Martinez to enter into the mortgage agreement. Although that goal was not itself unlawful, it was accomplished through unlawful means: the already discussed fraudulent misrepresentations to Martinez (falsifying the appraisal and informing him that he was qualified for the loan). Those fraudulent misrepresentations fulfill the

---

[17] It is true that many cases in this area treat fraud claims in terms of the traditional teaching to cub reporters about the opening paragraph of a news story, calling for "the who, what, when, where, and how." But where as here the allegations clearly set out the <u>circumstances</u> of the fraud--the literal requirement of Rule 9(b)--the absence of such detailed chapter-and-verse information does not render the Complaint legally insufficient.

ingredient of overt tortious acts in furtherance of the
conspiracy.  Hence the charge of civil conspiracy also survives
the joint motion to dismiss.

Credit Repair Organizations Act

Finally,[18] Freedom moves to dismiss Martinez' targeting of
it and Funes under the federal Credit Repair Organizations Act
("Credit Repair Act," 15 U.S.C. §§1679 to 1679j).  Under that
statute, any "person" is prohibited from making any untrue or
misleading statement to any other person to whom a consumer is
applying for an extension of credit when that statement bears
upon the consumer's credit worthiness, credit standing or credit
capacity (15 U.S.C. §1679b(a)(1)(B)(ii)).  Civil damages may be
awarded for any violation (15 U.S.C. §1679g(a)).  In this
instance Martinez complains that Freedom violated that section by
overstating his income and assets on the loan application
submitted to Encore (¶91).[19]

Freedom argues that it is not a "credit repair organization"
and thus cannot be liable under the statute.  Such a position

---

[18]  Because the Rule 12(b)(6) motion does not touch upon the
Complaint's Count VII asserting breaches of fiduciary duty, this
opinion need not do so either.

[19]  If Freedom's transmittal of false information to Encore
might be viewed as irreconcilable with the assertion that Freedom
conspired with Encore (a proposition that does not necessarily
follow, for the statute outlaws the <u>making</u> of the untrue or
misleading statement as such), such inconsistent pleading would
be permissible under Rule 8(e)(2) (<u>Moriarty v. Larry G. Lewis
Funeral Directors Ltd.</u>, 150 F.3d 773, 777 (7th Cir. 1998)).

runs afoul of the plain language of 15 U.S.C. §1679b(a), which prohibits any "person" from engaging in the prohibited activity. By using "person" in that subsection and "credit repair organization" in other subsections (such as the prohibition set out in 15 U.S.C. §1679b(b)), Congress clearly expressed the intention that no entity could engage in the proscribed conduct whether or not that entity qualified as a credit repair organization.[20]

Freedom further insists that Martinez did not allege that Freedom made misstatements regarding his credit worthiness, credit standing or credit capacity to a person to whom he was applying for credit. That argument is bogus, for the Complaint expressly alleges that Freedom overstated Martinez' income and assets on his loan application (¶¶43-44, 91). Martinez' income and assets are crucial components of his credit worthiness and credit capacity, and misrepresentation to Encore about those components were statements "with respect to" his credit worthiness and credit capacity. In short, Freedom's motion to dismiss the theory of recovery based on a Credit Repair Act violation is denied.

<u>Conclusion</u>

All aspects save one of the Rule 12(b)(6) motion for

---

[20] This approach is consistent with other caselaw in this District (see <u>Costa v. Mauro Chevrolet, Inc.</u>, 390 F. Supp. 2d 720, 727 (N.D. Ill. 2005), listing cases).

dismissal have failed upon analysis, and the motion is denied in toto except for Encore's challenge to Section 2N liability.  All defendants (including Funes) are ordered to answer the Complaint on or before January 4, 2008.  This action is set for a next status hearing at 9 a.m. January 11, 2008.

_____
Milton I. Shadur
Senior United States District Judge

Date:  December 19, 2007